UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:08CR545 HEA |
| | ) | |
| WILLIAM A. VINTON, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). The Defendant filed a motion to suppress evidence and statements [Doc. #19], and, after granting requests by the parties to continue the evidentiary hearing, a hearing on the Defendant's motion was held on December 17, 2008. Further, the undersigned ordered a transcript of the proceedings be prepared, and the transcript was filed on December 23, 2008.

Based upon the evidence adduced at the hearing on the motion to suppress as well as a review of the transcript and other evidence presented, the undersigned makes the following findings of fact and conclusions of law:

**Findings of Fact**

Andrew Brown is a detective with the City of St. John, Missouri police department. On December 19, 2007, Brown was involved in a theft investigation in which firearms and a firearms locker or safe were stolen from a resident of St. John, Missouri, named David Bales, Jr. Bales told detectives that a person known to him as David Lee took the guns from his house without anyone's permission, and that at the time he was with an older individual who had a mustache. After receiving

this information from Bales, Brown eventually contacted a friend of David Lee who told Brown that he had driven Lee to a house in Ferguson, Missouri, a short time prior to Brown talking to him, and that Lee had gone into the house. This person took Brown to the house where he believed Lee was located, and pointed it out to him. The address was 606 Teston, Ferguson, Missouri.

A short time later, Brown and two other officers went to 606 Teston to see if Lee or stolen firearms were in the house. Brown knocked on the front door of the house, and after waiting for some period of time, the Defendant answered the door. Brown told the Defendant he was investigating a theft, and asked the Defendant if he knew David Lee. The Defendant said that he knew Lee, and that Lee had been at his house, but had left shortly before the officers' arrival. Apparently because the Defendant had taken some time to come to the door and because two other people were seated in the front room of the house, Brown asked the Defendant if the officers could search the house to determine for certain that Lee was not present. The Defendant said it was okay for them to search the house, and one of the officers went downstairs to look for Lee while Brown went into the kitchen with the Defendant. The third officer stayed with the two individuals in the living room. After a short time, the officers determined that the two people sitting in the living room had nothing to do with their investigation, and they were asked to leave and did leave the house.

In the kitchen, Brown asked the Defendant his relationship to David Lee, and if he had been with Lee earlier in the day. In response to this, the Defendant asked Brown if his investigation had "anything to do with the guns." When Brown said that it did, the Defendant said that he knew the guns did not belong to Lee. Brown then asked the Defendant if he was aware of the location of the guns, and the Defendant said that the guns were on the shelf in his closet, and that there was a gun safe or gun locker in the basement.

2

When the Defendant told Brown this information, Brown asked the Defendant for his permission to search the house for contraband, including firearms and narcotics. The Defendant said that the officers could search the entire house for this type of contraband. A total of five minutes elapsed from the time the Defendant answered the front door of the house to the time he consented to the search of his premises for contraband. During this time, no guns were drawn by the officers, the Defendant was not physically restrained, voices were not raised, and no threats or promises were made to obtain either the Defendant's consent or any statements from him.

Pursuant to the consent, a search was conducted of the house. From the Defendant's bedroom closet, the officers seized a .38 caliber pistol, a .22 caliber rifle, and a .20 gauge shotgun. These guns matched the description of the stolen guns. From the basement of the house, the officers seized a gun safe or gun locker which matched the description of the stolen gun safe. From the living room of the house, the officers seized a sawed-off shotgun, and two ammo cases which contained ammunition. Also seized were miscellaneous controlled drugs. After finding the stolen property and sawed-off shotgun, the Defendant was placed under arrest and driven by Brown to the St. John police station.

After arriving at the police station, the Defendant was taken to an interview room, and the Defendant's statement was taken by Brown. The complete interview was video and audio recorded. Prior to the Defendant being asked any questions, the Defendant was advised of his rights by Brown using an advice of rights form. After the Defendant generally stated he understood his rights, Brown asked the Defendant if he could read or write. When the Defendant stated that he could not, Brown read his rights to him from the form. Brown read each right from the form, and after each right asked the Defendant if he understood the right. The Defendant either affirmatively replied or nodded his

3

head that he understood each right. At the end of the advice of rights and before Defendant signed the form stating he understood his rights, Brown asked him to sign the form if he understood his rights and then asked the Defendant, "Do you understand everything?" And the Defendant replied, "Yeah." The Defendant then signed the advice of rights form on the line stating he understood his rights. The Defendant also dated the form and wrote down the time. Brown did not show the Defendant how to sign his name or how to write the numbers "12/19/07" or the numbers "12:20."

After this, Brown told the Defendant he wanted to ask him some questions, and he read the waiver form to the Defendant. Again, the Defendant stated he understood the waiver form and signed and dated the waiver portion of the form. The Government also showed through the testimony of a Dellwood police officer that the Defendant had been arrested about eight months before his arrest in this case. At that time, the Defendant was fully advised of his rights from an advice of rights form which was read to him. The Defendant on that date again stated that he understood his rights and waived his rights. The Defendant told the officer on that occasion, April 29, 2007, that he could read and write. The Government also presented evidence that the Defendant was arrested on theft charges approximately six weeks after the arrest in this case. At that time, the Defendant consented to the search of his house, and again was advised of his rights by a police officer, stated he understood his rights, and waived his rights by signing his name. On this occasion, the Defendant also told the officer that he could both read and write.

The Defendant also presented testimony at the hearing. Daniel Barry testified for the Defendant that he was in the house at the time the police came to the door. He stated that he was watching a movie with another person and Vinton, and could only barely hear the knock at the door because of the movie being played in "surround" sound. He said that Vinton answered the door and

4

the officers told him they were looking for David Lee. He said that the officers said that Lee was suspected of molesting a young girl. The Defendant told them that Lee was not at the house. He said that the officers walked by him and searched the house anyway without asking his permission. He said that one of the officers asked his name, and he gave the officer a false name because he was wanted by the police. He also said that he had felony convictions. The defense also presented the testimony of their investigator Amy Skrien, who said she had talked to another individual on the telephone who said that he was present in the apartment when the officers knocked on the door. This person refused to give the investigator his last name, and would only identify himself as "Taz." He apparently would not meet personally with the Public Defender's investigator and refused to show up to testify at the hearing in this matter. In addition, Skrien testified that she talked to the Defendant's girlfriend who stated that she was present in the apartment at the time the officers came to the apartment, but was hiding in one of the bedrooms. Skrien served a subpoena on the girlfriend to testify at the hearing on the motion to suppress in this matter. The Defendant's girlfriend did not come to the hearing and ignored the subpoena. The undersigned offered to issue an arrest warrant for this witness, however, that offer was declined. Based on the above the undersigned concludes that the statements made by "Taz" and Defendant's girlfriend are not trustworthy or reliable. Therefore, the undersigned will not consider the testimony presented by way of hearsay, through the investigator, of "Taz" and the Defendant's girlfriend. [1]

---

[1] The Defendant's theory for admitting the hearsay testimony is that the officers admitted obtaining the names of the two individuals in the living room, and that the Government, thus, waived its right to object to the testimony. At the hearing, Det. Brown unequivocally testified that the names of the people in the living room were never obtained or recorded, and they were quickly asked to leave the premises because they were not necessary to the investigation. Thus, the Defendant's argument fails on this issue.

Further, the undersigned finds that to the extent that Mr. Barry's testimony conflicts with Det. Brown's, the undersigned accepts Det. Brown's testimony and rejects that of Barry. There is no evidence other than Barry's testimony that the officers wanted to find Lee for anything other than theft, and the investigation had nothing to do with Lee molesting a young girl. In addition, although Barry testified that he could barely hear the knock on the door because of the volume of the television, he stated as soon as the door was opened he could hear the conversations between the Defendant and the police. The undersigned concludes that if Barry could barely hear a knock on the door, the chances of him accurately hearing a conversation which took place at the door or on the front porch is also diminished. In addition, Barry admits that he lied to the police about his identity.

The undersigned further concludes that Det. Brown was a credible witness who answered questions on direct and cross examination in a forthright manner. His testimony as to the nature of his interview with the Defendant is corroborated by the videotape that was introduced into evidence. Therefore, to the extent that Barry's testimony conflicts with Det. Brown, the undersigned accepts Det. Brown's testimony in its entirety and rejects that of Barry.

**Conclusions of Law**

A. Defendant's Pre-Arrest Statements and Consents to Search Made at 606 Teston

    1. Custody

Based on the above findings, the undersigned concludes that the statements of the Defendant made prior to the Defendant being formally arrested by Brown were non-custodial statements. In determining whether the Defendant was in custody, the court must consider whether under the totality of the circumstances, the officers deprived the Defendant of his freedom of action in a

6

significant way, and if a reasonable person under similar circumstances would believe that he was under arrest. See Berkemer v. McCarty, 468 U.S. 420 (1984).

In United States v. Sutera, 933 F.2d 641 (8th Cir. 1991), FBI agents executed a search warrant on the defendant's apartment, defendant's car, and on defendant's person, and thoroughly searched the defendant for weapons. His movement was also restricted in his apartment in that he could not go into areas that were being searched, and was accompanied by agents. He was further accompanied to a second location by agents to obtain documents. In stating that the defendant was not in custody, the Court stated as follows:

> It is also relevant that Sutera was "on his own turf." Except for the brief period when Sutera and Burns drove to get the address book, Sutera was interviewed in the apartment that he was occupying. While a person may be deemed to be in custody even in his own home, it is not the type of coercive setting normally associated with custodial interrogation.

United States v. Sutera, 933 F.2d 641, 647 (8th Cir. 1991).

In United States v. Axsom, 289 F.3d 496 (8th Cir. 2002), nine FBI agents executed a search warrant at the defendant's house at 6:45 a.m. The defendant answered the door wearing only a towel and the nine agents immediately entered the house. As soon as they entered the house, they observed several firearms hanging on the walls of the premises. They first proceeded to secure the weapons. Next, the agents escorted the defendant to his bedroom where he was allowed to dress, and taken to the living room where he was told to sit down on the couch. Two agents then interviewed the defendant for about an hour. When the defendant got up as if to get a drink of water, the agents did not allow him to get a drink, and instead told him they would get the water for him. When the defendant wanted to go to the bathroom, he was escorted by an agent to the bathroom and not

allowed to go to the room by himself. In stating the test to be followed in determining whether the defendant is in custody, the Court stated:

> Custody occurs when a suspect is deprived of his freedom of action in any significant manner. . .In deciding whether a person was "in custody," we must examine both the presence and extent of physical and psychological restraints placed upon the person's liberty during interrogation "in light of whether a 'reasonable person in the suspect's position would have understood his situation' to be one of custody." . . . Thus, if Axsom believed his freedom of action had been restrained to a "degree associated with formal arrest" and his "belief was reasonable from an objective viewpoint," then Axsom was "held in custody during the interrogation."

289 F.3d 496, 500. In determining that the defendant was not in custody because of a police dominated atmosphere, the Court stated that this was mitigated by the fact that only two agents were involved in the interview while the rest searched the premises. They further held that the fact that the defendant's movements were restricted during his interview was not enough to show that he was "in custody." In so holding, the Court stated as follows:

> While nine persons participated in the execution of the search warrant, only two agents conducted the interview. . .Photographs of Axsom and federal agents taken at or near the time of the questioning reflect a more casual scene than a police dominated, inherently coercive interrogation. When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial.

289 F.3d 496, 502. As to the fact that Axsom's freedom was limited, the Court stated as follows in holding that the defendant was not in custody:

> Although evidence exists to support the district court's finding that the agents restrained Axsom's freedom of action, his freedom was not restrained to a "degree associated with formal arrest." California v. Beheler, 463 U.S. 1121, 1125. . . (1983). Axsom was not handcuffed, nor was he confined to one room.

Axsom, 289 F.3d 496, 502.

Based on the above, the undersigned concludes that the Defendant was not in custody during the time that he was in his house prior to the weapons being found and the Defendant being arrested

and handcuffed. As in Axsom, although there were three officers at the Defendant's door, the evidence shows that only Det. Brown talked to the Defendant in the kitchen of the house. In addition, the conversation lasted a total of five minutes from the time that the officers entered the door to the time the Defendant consented to the full search of his house. In addition, the Defendant's movements were not significantly restricted during this five- minute time frame, the officers did not raise their voices to the Defendant, they did not draw their guns, and they did not threaten, coerce, or promise the Defendant anything. During the interview, the Defendant was standing in his own kitchen with the officers, and he his movement was not restricted in any way consistent with formal arrest. He was not handcuffed or otherwise physically restrained. Therefore, the undersigned concludes that the Defendant could not reasonably believe that he was in custody while standing in his own kitchen being questioned by one officer while he was not physically restrained. Thus, the undersigned concludes that the Defendant's statements as well as his consent to search the premises were made in a non-custodial environment, and it was not required that the Defendant be given his Miranda warnings. See Berkemer v. McCarty, supra. The fact that a subject may have been a suspect in a crime does not trigger any right on his part to be given Miranda warnings. California v. Beheler, 463 U.S. 1121 (1983).

For the above reasons, the undersigned also concludes that the statements were voluntary.

2. Consent to Search

The undersigned concludes that the search of the premises both as to the initial search for David Lee and the search for weapons and drugs was lawful. Police officers may search premises if they obtain consent to do so from someone who has adequate authority over the premises. Consent is voluntary if it is the product of free choice and not given under duress or coercion. Voluntariness

9

is a fact question to be determined from the totality of the circumstances present. See Schneckloth v. Bustamonte, 412 U.S. 218 (1973); United States v. Matlock, 415 U.S. 164 (1974). Among the factors to be considered in determining whether consent is voluntary include the following: whether the person who consented was detained and questioned for a long or short time; whether the person was threatened, physically intimidated, or punished by the police; whether the defendant relied on promises and representations made by the police; whether the defendant was in custody or under arrest when consent was given; whether consent was given in a public or secluded place; whether the defendant objected to the search or stood silently while the search occurred; the age of the defendant; the general intelligence of the defendant; whether the defendant was intoxicated or under the influence of drugs; whether they had consented after being informed of their rights; whether because they had previously been arrested they were aware the protections afforded to suspected criminals by the legal system. See United States v. Chaidez, 906 F.2d 377, 381, 382 (8th Cir. 1990); see also United States v. Willie, 462 F.3d 892 (8th Cir. 2006).

Given the above factors, the undersigned concludes there is little doubt that the consent was voluntarily given. The Defendant, at the time the consent was given, at the most had been questioned by Brown in his kitchen for five minutes, therefore, he had not been detained for a long period of time. The Defendant was not threatened, physically intimidated or punished by the police. No promises or misrepresentations were made to him by the police, nor was he in custody or under arrest when the consent was given. The consent was given in his own kitchen, and was not given in a police station or another secluded place. The evidence shows that the Defendant did not object to the search at any time, and was, in fact, cooperative with the officers in allowing the search. In addition, the Defendant is over forty years of age, and, according to the officer, was rational and not

10

intoxicated or under the influence of any drugs while he consented. Further, although the Defendant had not been formally advised of his Miranda rights, he certainly was no novice to the legal system, and had been arrested on at least thirty prior occasions. On at least one of those occasions, he had been fully advised of his rights by a police officer, stated he understood his rights, and waived his rights. Further, prior to going to the premises, Det. Brown was aware that the Defendant had been convicted of multiple felony crimes. In addition, at the time the consent was given, the Defendant was answering Brown's questions in a rational manner, and Brown had no reason to question the Defendant's general intelligence or education level. Therefore, based on all of the above, the undersigned concludes that the consent was voluntarily given and, therefore, the evidence seized should not be suppressed.

### B. Post-Arrest Statements

Based on the above facts, the undersigned concludes that the Defendant's waiver of his rights was knowing, intelligent, and voluntary. The Government has the burden of showing that a Defendant's statement is voluntary, and, further, that the waiver of the Defendant's Miranda rights is both voluntary and "knowing and intelligent." See Colorado v. Spring, 479 U.S. 564 (1987), United States v. Turner, 157 F.3d 552 (8th Cir. 1998). Regarding custodial statements, the Eighth Circuit Court of Appeals has stated:

> The appropriate test for determining the voluntariness of confession is whether, in light of totality of the circumstances, pressures exerted upon suspect have overborne his will. . .

United States v. Meirovitz, 918 F.2d 1376 (8th Cir. 1990). Further, in holding that a defendant's mental condition and his statements that he had been hearing voices and was suicidal were not sufficient to overbear his will, the Court stated as follows:

> Although mental condition is relevant to a suspect's susceptibility to police coercion, coercive police activity is a necessary predicate to a finding that a confession was not voluntary within the meaning of the Due Process Clause. . .Even if police were coercive, Galceran failed to show he suffered from a mental illness at the time of the interview that, when combined with coercion, produced a confession that was not a product of his own free intellect. . .Indeed, the Government's evidence shows Galceran was rational and freely gave his statement.

United States v. Galceran, 301 F.3d 927, 931 (8th Cir. 2002).

In United States v. Turner, supra, the Court rejected Turner's argument that his waiver was not knowing and intelligent because he was impaired by a low I.Q., PCP intoxication, and mental illness. In upholding the waiver as knowing and intelligent, the Court stated as follows:

> Henderson testified that Turner was cooperative, reviewed and initialed each admonition of the waiver form, agreed to answer questions, and gave accurate information, including the name and telephone number of the owner of the car. . .In addition, as the government notes, at the time he was stopped, Turner acted in a manner more consistent with a person attempting to avoid being caught then a person who did not know what he was doing. For example, Turner denied consuming alcohol, but refused to answer questions about drugs and gave a false name.

157 F.3d 552, 555, 556.

Further, the fact that the Defendant had a history of arrests and convictions, and was not a novice in the criminal system is relevant to whether or not he knowingly and intelligently waived his Miranda rights. See United States v. Griffith, 533 F.3d 979 (8th Cir. 2008). In Correll v. Thompson, 63 F.3d 1279 (4th Cir. 1995), the Court upheld the introduction of a confession against a claim that the Defendant's waiver of his rights was not knowing and voluntary because of his reduced I.Q. In rejecting this claim, the Court stated as follows:

> Further, the totality of the circumstances indicates that Correll's waiver was knowing and intelligent. Although Correll possessed an I.Q. of only 68, he was 24 years old and had numerous experiences with law enforcement and Miranda warnings; the trial court characterized Correll as "street wise."

63 F.3d 1279, 1288, 1289.

Based on the above law, the undersigned concludes that the Defendant's statements were voluntarily made and that his waiver was knowing and intelligent. Initially, the undersigned concludes that there was no evidence presented as to the degree of impairment of the Defendant or whether he could read or write other than his statement to Officer Brown during his interview at the St. John's Police Department. Regarding this, the Government presented evidence showing that on at least two occasions in reasonably close proximity to the Defendant's advice of rights in the instant case, the Defendant had told other police officers that he could, in fact, read and write. In addition, after telling Brown that he could not read or write, Brown read him each Miranda right and asked the Defendant if he understood the right. The Defendant indicated that he understood his rights. The undersigned has further viewed the video tape, and the Defendant's answers to the questions asked by Brown appear to be responsive to those questions and rational. Far from admitting his guilt in the theft of these guns, the Defendant tells Brown that he believes that the guns belonged to David Lee, and that they were not stealing them but merely retrieving Lee's guns from Bale's house. In addition, as in Correll v. Thompson, supra, the Defendant is no novice to the criminal justice system. The evidence shows that the Defendant had been arrested on about thirty occasions, has felony convictions, and had been advised of his rights on numerous occasions. Further, the evidence shows that the Defendant was not threatened in any way, nor was he coerced or promised anything either to obtain his waiver or his statement. During the statement, the Defendant was in an interview room at the police department, however, only he and Det. Brown were present in the room. The undersigned finds nothing in the video tape to indicate that Brown raised his voice to the Defendant or otherwise tried to trick the Defendant into making a statement. Therefore, the undersigned concludes that the waiver was knowing and intelligent, and the statement was voluntary and should

not be suppressed. See Miranda v. Arizona, 384 U.S. 436, 467-75 (1966); North Carolina v. Butler, 441 U.S. 369 (1979); Colorado v. Connelly, 479 U.S. 157 (1986); Moran v. Burbine, 475 U.S. 412 (1986).

**Conclusion**

Therefore, the Defendant's motion to suppress evidence and statements should be denied.

\* \* \*

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements and Evidence [Doc. #19] be **denied**.

Further, the parties are advised that they have eleven (11) days in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

       /s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of January, 2009.